**PAN–AM SOUTHERN CORPORATION,**
Plaintiff,

v.

**Jack W. CUMMINS, Defendant.**

**Civ. A. No. 1074.**

United States District Court
E. D. Tennessee, Northeastern D.
May 17, 1957.

Cox, Epps, Powell & Weller, Johnson City, Tenn., for plaintiff.

Green & Bryant, Johnson City, Tenn., for defendant.

ROBERT L. TAYLOR, District Judge.

Plaintiff has filed what is styled "Various Motions Of Plaintiff After Entry Of Judgment." In substance the motions are as follows:

1. That the verdict of March 20, 1957, and the judgment of April 3, 1957, be set aside and judgment be entered for the plaintiff.

2. In the alternative, that the judgment be set aside and the Court's own

findings be substituted for the jury's verdict or a new trial be granted in lieu of such findings.

3. In the alternative, that the verdict and judgment be set aside and plaintiff be granted a new trial.

4. That said judgment be set aside and that the Court thereupon make special findings of fact and separate conclusions of law, pursuant to Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.

5. That the Court find the facts specially and the conclusions of law separately thereon, pursuant to Rule 52(a).

6. That the Court make special findings of fact and separate conclusions of law and having so found amend the judgment heretofore entered by the reversal thereof in favor of the plaintiff.

Incorporated in the foregoing motions are those made by plaintiff after evidence and after verdict, with all of the grounds urged in their support, pertinent grounds being the alleged insufficiency of the evidence to support a verdict or judgment in favor of the defendant, impropriety of admitting evidence respecting the inducement and nature of the lease transactions, impropriety of submitting any issues to a jury, and lack of responsiveness to the pleadings of the issues presented to the jury.

■ It was at the conclusion of the evidence and is now the Court's opinion that there was clear and cogent evidence to support a verdict for defendant on the issues presented to the jury and that such verdict, once rendered in favor of defendant was entitled to the respect of the Court. Werthan Bag Corp. v. Agnew, 6 Cir., 202 F.2d 119.

■■ It was then and is now the Court's opinion that the action as commenced by plaintiff was in substance one in ejectment or unlawful detainer; that it was an action affecting real property, hence was a local action controlled by local law, including common law and statutory law; that defendant's counterclaim, though it involved equitable matters, was essentially a defense against plaintiff's action for the recovery of possession of real property, and that by the local law there was no impropriety in submitting certain decisive issues to the jury. 28 U.S.C. § 1652; Tennessee Code Annotated, secs. 23–1302, 23–1604, 23–1606, 23–1632, and 23–1621. As to the equitable character of the counterclaim, there was still no impropriety in submitting decisive fact issues to a jury. Tennessee Code Annotated, secs. 21–1011 and 21–1014; Mutual Life Ins. Co. of New York v. Burton, 167 Tenn. 606, 72 S.W.2d 778.

■ As to alleged lack of responsiveness as between the issues submitted to the jury and the pleadings, attention is called to Issue No. 1 of the Pretrial Order, which issue is stated thus: "Should the instruments referred to in the complaint be construed together, and if so should they be held to be financial transactions in the nature of a mortgage rather than leases?" A great quantity of proof was directed toward this question and following the conclusion of the evidence the questions of fact submitted to the jury were directed specifically to that particular issue and none other. In the verdict form presented to the jury for the rendering of its special verdict it was indicated that the result of affirmative answers would be cancellation of the instruments or their reformation to give them the effect of mortgage transactions. Under the local law and rule respecting special verdicts, the verdict was conclusive of the case. Wright v. Jackson Construction Co., 138 Tenn. 145, at pages 149–150, 196 S.W. 488, at page 489. See, also, Geis Construction Co. v. United States of America, 6 Cir., 243 F.2d 568 (April 24, 1957).

■ Respecting the admission of evidence as to the inducement and nature of the transactions between defendant and agents of the plaintiff, recognized rules of the forum state applicable in real property controversies, especially with respect to reformation, were adhered to. Gibson County v. Fourth & First Nation-

al Bank, 20 Tenn.App. 168, at pages 178–179, 96 S.W.2d 184, at pages 189–190; Mee v. Mee, 113 Tenn. 453, at page 456, 82 S.W. 830; Jones v. Cullen, 100 Tenn. 1, at page 20, 42 S.W. 873, at page 877; Hughes v. Young, 17 Tenn. App. 24, 65 S.W.2d 858; Torbett v. Jones, 19 Tenn.App. 307, at page 312, 86 S.W.2d 898, at page 901. See, also, McCormick on Evidence, 1 ed., page 449, sec. 221.

█ From consideration of the evidence, the jury's verdict and the applicable statutes and decisions, it is the Court's opinion that the various motions of plaintiff, including those not heretofore ruled on, should be overruled, with the exception of that part or those parts of the same which call for special findings of fact and separate conclusions of law. Grounds of uncertainty and possible conflict existing between state statutes, rules, equity practice, and court decisions on the one hand and Rules 38, 39 and 52(a) of the Federal Rules of Civil Procedure on the other, lend some plausibility to suggestions that the jury's verdict should be treated as advisory only. In deference to the federal rules and in response to plaintiff's motions relative thereto, the Court accordingly makes the following findings of fact and conclusions of law:

## Findings of Fact

1. On February 12, 1954, defendant was owner in fee simple of service station premises designated in the record as Service Station No. 1367 and situated in Johnson City, Washington County, Tennessee.

2. On said date and prior thereto negotiations had been carried on between representatives of Pan-Am Southern Corporation, hereinafter called Pan-Am or plaintiff, on the one hand, and Jack W. Cummins, hereinafter referred to as Cummins or defendant, on the other for the leasing of said premises by the defendant to the plaintiff.

3. On said date and for some time prior thereto defendant had been experiencing financial difficulties, being indebted to plaintiff and others.

4. In the course of the negotiations mentioned in finding No. 2 above, agents of the plaintiff made known to the defendant that plaintiff could and would be willing to negotiate for defendant a loan from a certain bank, identified in the record as The National Bank of Commerce in New Orleans, provided certain leasing arrangements were made and the rentals therefrom pledged as security.

5. As a necessary incident to the loan, plaintiff was advised that he would be required to mortgage the service station premises to the bank and that the mortgage would provide for monthly payments thereon of a sum exactly equal to the fixed monthly rental.

6. Defendant was further advised by agents of plaintiff that the bank would not accept defendant's own and sole obligation to assign the monthly rentals to be received from him, but that it would accept such an obligation if joined in by the plaintiff.

7. Defendant was further advised by agents of plaintiff that a lease of the service station premises by defendant to plaintiff and a lease from plaintiff back to the defendant, the primary lease and the back-lease being at the same stipulated rental, with the attendant mortgage and assignment of rentals to the bank, would satisfy the bank's requirements.

8. Pursuant to negotiations between plaintiff, defendant and the bank, the terms of a loan were agreed upon, as well as the terms and conditions of the security.

9. On February 12, 1954, defendant Cummins and his wife, Jewel M. Cummins, executed an instrument whereby they leased said premises to Pan-Am.

10. The lease aforesaid was for a term of 10 years from March 1, 1954, with the privilege in the plaintiff as lessee of two successive extensions of 5 years each.

11. The monthly rental provided in the lease was $175.16, plus one cent per gallon on gasoline delivered to Service Station No. 1367 for sale in excess of 17,516 gallons for any particular month.

12. On February 12, 1954, defendant Cummins and wife, Jewel M. Cummins, executed a mortgage whereby they conveyed the said premises in trust for The National Bank of Commerce in New Orleans to secure a loan from the bank in the sum of $17,300.

13. On February 12, 1954, Cummins and his wife, Jewel M. Cummins, executed an assignment to the bank of the rental of $175.16 specified in the aforesaid lease of February 12, 1954, said rental being the monthly installment by which the loan was to be repaid.

14. Pan-Am joined in this assignment and therein agreed to pay said monthly rental to the bank until the indebtedness should be paid in full.

15. On February 17, 1954, plaintiff Pan-Am leased the aforesaid service station premises back to defendant Cummins.

16. The monthly rental and gallonage provisions were the same as those contained in the primary lease from the defendant to the plaintiff of February 12, 1954, as shown in finding No. 11 above.

17. The primary lease, the mortgage and the assignment aforesaid were acknowledged before a notary public on February 17, 1954, the date of the back-lease from Pan-Am to Cummins.

18. The primary lease from Cummins to Pan-Am contained no cancellation privilege in favor of defendant Cummins.

19. The lease from plaintiff Pan-Am to defendant Cummins provided that for certain enumerated causes Pan-Am could terminate the lease without notice.

20. The back-lease from plaintiff to defendant was by its terms made subject to all the terms and conditions of a distributor's sales contract between plaintiff and defendant dated March 1, 1952, and then in force and operation.

21. The distributor's sales contract aforesaid provided that it should run from year to year unless cancelled by either party upon notice 90 days before the end of any expiring year, or upon 30 days notice for cause.

22. The primary lease aforesaid was not made cancelable or terminable by reason of cancellation or termination of the distributor's sales contract, but the back-lease from plaintiff Pan-Am to defendant Cummins provided that upon expiration or termination of the distributor's sales contract, the back-lease "shall also terminate forthwith, anything herein contained to the contrary notwithstanding."

23. As a result of the primary lease from defendant Cummins to plaintiff Pan-Am, of the back-lease from plaintiff Pan-Am to defendant Cummins, and of the distributor's sales contract, it was possible for Pan-Am to deprive Cummins of possession and control of property owned by Cummins in fee simple and to exercise that deprivation for a period of twenty years.

24. By 90-day notice given December 31, 1955, plaintiff Pan-Am undertook to take that possession and control away from defendant Cummins by termination of the distributor's sales contract, by the resultant termination of the back-lease and by retention of the primary lease with its possible 20-year tenure in favor of Pan-Am.

25. Defendant Cummins did not anticipate or contemplate this long-period loss of possession and control of his property and would not have entered into the transactions as lease transactions alone, but entered into all of the transactions for the purpose of obtaining and of giving security for a loan from the bank.

26. There was no sale of excess gallonage of gasoline prior to the notice of termination of December 31, 1955.

27. The monthly rental, therefore, was the fixed rental of $175.16.

28. As a result of the termination, if the same were allowed to stand, plaintiff Pan-Am would be obligated to pay the

monthly rental of $175.16, plus one cent per gallon for gallons of gasoline delivered for sale in excess of 17,516 for any month.

29. Defendant Cummins would be obligated to "keep the building, the water pipes, drains and sewers appurtenant thereto and all of Lessor's equipment on the demised premises in good and sufficient condition and repair during the whole of the term hereof," or for a possible 20 years.

30. The following obligation, also, would continue to rest upon defendant Cummins: "It is mutually agreed that if the leased premises are damaged by fire, storm, or from any other cause, such damage shall be repaired by the Lessor forthwith after the same occurs, and if the extent of such damage is such as to render said premises untenantable, the obligation of the Lessee to pay rent shall cease until the Lessor shall have replaced said premises in a tenantable condition."

31. The following obligation, also, would continue to rest upon defendant Cummins: "It is further mutually agreed that Lessor shall pay all taxes and assessments that may be levied against the above described premises and the building and equipment belonging to Lessor thereon, * * *."

32. The reasonable cash value of said premises is $70,000.

33. The reasonable rental value of said premises is $700 per month.

34. Under plaintiff's take-over plan, plaintiff Pan-Am would have the possession, use and control of the premises at a monthly rental of $175.16, or $525 less than its monthly rental value, and would not be obligated to bear any part of the expenses of taxes, insurance or maintenance.

35. A rental of $175 per month would absorb a depreciation of less than 3%, based upon a valuation of $70,000. With depreciation, insurance, maintenance, and taxes combined, the result would be that defendant Cummins would receive approximately nothing from his investment over a period of twenty years.

36. On February 12, 1954, defendant Cummins was owner in fee simple of service station premises designated in the record as Service Station No. 1370 and situated in the City of Elizabethton, Carter County, Tennessee.

37-46. Findings of facts numbered hereinabove from 2 to 10, both inclusive, with reference to Service Station No. 1367 are herewith incorporated by reference as findings from 37 to 46, both inclusive, with reference to Service Station No. 1370.

47. The monthly rental provided in the lease for Service Station No. 1370 was 125.55 plus one cent per gallon for all gasoline delivered to this station for sale in excess of 12,555 gallons in any monthly period.

48. On February 12, 1954, Cummins and his wife, Jewel M. Cummins, executed a mortgage whereby they conveyed the said premises No. 1370 in trust for The National Bank of Commerce in New Orleans to secure a loan from the bank in the sum of $12,400.

49. On February 12, 1954, Cummins and his wife, Jewel M. Cummins, executed an assignment to the bank of the rental of $125.55 specified in the lease of February 12, 1954 of premises No. 1370, said rental being the monthly installment by which the loan was to be repaid.

50. Pan-Am joined in this assignment and therein agreed to pay said monthly rental to the bank until the indebtedness should be paid in full.

51. On February 17, 1954, plaintiff Pan-Am leased the aforesaid Service Station No. 1370 back to defendant Cummins.

52. The monthly rental and gallonage provisions were the same as those contained in the primary lease from the defendant to plaintiff of February 12, 1954.

53. The primary lease, the mortgage and the assignment affecting Station No. 1370 were acknowledged before a notary public on February 17, 1954, the date

of the back-lease from Pan-Am to Cummins.

54–61. Findings of fact numbered hereinabove from 18 to 25, both inclusive, with reference to Service Station No. 1367 are herewith incorporated by reference as findings from 54 to 61, inclusive, with reference to Service Station No. 1370.

62. There was no excess gallonage prior to December 31, 1955, the date of the notice of termination by Pan-Am.

63. The monthly rental, therefore, was $125.55.

64. As a result of the termination, if the same were allowed to stand, plaintiff Pan-Am would be obligated to pay the monthly rental of $125.55, plus one cent per gallon for gallons delivered for sale in excess of 12,555 in any month.

65–67. Findings of fact numbered hereinabove from 29 to 31, both inclusive, with reference to Service Station No. 1367 are herewith incorporated by reference as findings from 65 to 67, inclusive, with reference to Service Station No. 1370.

68. The reasonable cash value of Service Station No. 1370 is $28,000.

69. The reasonable rental value of Service Station No. 1370 is $275 per month.

70. Under plaintiff's take-over plan, plaintiff Pan-Am would have the possession, use and control of Service Station No. 1370 at a monthly rental of $125.55, which is about $150 less than its monthly rental value, and Pan-Am would not be obligated to bear any part of the expenses of taxes, insurance or maintenance.

71. A rental of $125.55 would absorb a depreciation of slightly more than 5% based on a valuation of $28,000. Depreciation, insurance, maintenance, and taxes combined would substantially reduce the net result of the rental income, leaving to defendant Cummins a grossly inadequate return on his investment.

72. On July 26, 1955, defendant Cummins was owner in fee simple of service station premises designated in the record as Service Station No. 1578 and situated in Johnson City, Washington County, Tennessee.

73. On said date of July 26, 1955, Cummins and his wife, Jewel M. Cummins, executed an instrument whereby they leased said Service Station No. 1578 to plaintiff Pan-Am.

74. The lease of Service Station No. 1578 was for a period of 15 years from August 1, 1955, with the privilege in plaintiff Pan-Am as lessee of 3 successive extensions of 5 years each.

75. The monthly rental provided in the lease was $147.94 plus one cent per gallon on each gallon of gasoline delivered to said station for sale during any monthly period in excess of 10,000 gallons, the rental in no event to exceed $200 per month.

76. On July 26, 1955, defendant Cummins and his wife, Jewel M. Cummins, executed a mortgage whereby they conveyed the said premises in trust for The National Bank of Commerce in New Orleans to secure a loan of $20,000.

77. On July 26, 1955, defendant Cummins executed an assignment to The National Bank of Commerce in New Orleans of the rental of $147.94 specified in finding No. 76 above.

78. Plaintiff Pan-Am joined in this assignment and therein agreed to pay said monthly rental to the bank until the indebtedness should be paid in full.

79. On September 5, 1955, plaintiff Pan-Am leased Service Station No. 1578 back to defendant Cummins for a period of 12 months, which period by hold over might be extended for periods of 6 months, terminable by either party upon 10 days notice at the end of any 6 months period, but subject to termination upon termination of the distributor's sales contract between plaintiff and defendant bearing date of March 1, 1952, the rental provided in this back-lease being the same as provided in the primary lease, as shown in finding No. 75 above.

80. In the lease of July 26, 1955, from defendant Cummins to plaintiff

Pan-Am there existed no cancellation or termination right in favor of defendant Cummins.

81. The distributor's sales contract aforesaid provided that it should run from year to year unless cancelled by either party upon notice 90 days before the end of any expiring year, or upon 30 days notice for cause.

82. As a result of the primary lease from defendant Cummins to plaintiff Pan-Am, of the back-lease from plaintiff Pan-Am to defendant Cummins, and of the distributor's sales contract, it was possible for Pan-Am to deprive Cummins of possession and control of property owned by Cummins in fee simple and to exercise that deprivation for a period of 30 years.

83. By 90-day notice given December 31, 1955, plaintiff Pan-Am undertook to take that possession and control away from defendant Cummins by cancellation of the distributor's sales contract, by the resultant termination of the back-lease and by retention of the primary lease with its possible 30-year tenure in favor of Pan-Am.

84. Notwithstanding that the back-lease was not executed until more than one month following execution of the primary lease of Service Station No. 1578, it was included within the negotiations and representations mentioned in findings 2 to 8, both inclusive, that such back-lease would be executed and that all of the instruments pertaining to station No. 1578 were collectively for the purpose of obtaining and providing security for a loan from the bank.

85. Defendant Cummins did not anticipate or contemplate the long-term loss of possession and control of station No. 1578 and would not have entered into the transactions as lease transactions alone, but entered into them for the purpose of obtaining the loan and as a means of securing the loan.

86. There was excess gallonage during one monthly period prior to the notice of termination of December 31, 1955.

87. Except for that one month, the monthly rental stood at $147.94.

88. As a result of the termination, if the same were allowed to stand, plaintiff would be obligated to pay the monthly rental of $147.94, plus one cent per gallon for gallons delivered for sale in excess of 10,000 in any month, the total rental not to exceed $200 per month.

89–91. Findings numbered 29, 30 and 31 with reference to Service Station No. 1367 are herewith incorporated by reference as findings numbered 89, 90 and 91 with reference to Service Station No. 1578.

92. The reasonable cash value of Service Station No. 1578 is $34,000.

93. The reasonable rental value of Service Station No. 1578 is $340 per month.

94. Under plaintiff Pan-Am's take-over plan, plaintiff would have the possession, use and control of Service Station No. 1578 at a monthly rental of about $147.94, which is approximately $193 less than its monthly rental value, which rental value to be paid by plaintiff being considerably less than one-half of the reasonable rental value, and plaintiff Pan-Am would not be obligated to bear any part of the expenses of taxes, insurance and maintenance.

95. A rental of $147.94 per month, subject to gallonage, increase, would absorb an annual depreciation of slightly over 5%, based upon the valuation of $34,000. With depreciation, insurance, maintenance, and taxes combined, the result would be that defendant Cummins would receive approximately nothing from his investment over a period of 30 years.

96. On December 16, 1946, and prior thereto, defendant Cummins was owner of a leasehold estate from Clinchfield Railroad in service station premises designated in the record as Service Station No. 1375, situated in Johnson City, Washington County, Tennessee, for which he paid a current ground rent of $65 per month.

97. On December 16, 1946, defendant leased station No. 1375 to plaintiff Pan-Am for a period of 10 years with the right in Pan-Am to extend the lease for two additional periods of 5 years each.

98. The monthly rental provided in said lease to Pan-Am was $85 plus one cent per gallon of gasoline for each gallon delivered to said station for sale in excess of 8,500 gallons in any monthly period.

99. On said date, namely, December 16, 1946, plaintiff Pan-Am leased station No. 1375 back to defendant Cummins.

100. The monthly rental and gallonage provisions in said back-lease were the same as those contained in the primary lease mentioned in finding No. 98, above.

101. Said lease and back-lease of station No. 1375 were entered into as part of a contemplated security transaction whereby plaintiff Pan-Am was to be the lender and defendant Cummins the borrower of funds for construction of a service station on the leasehold premises.

102. The loan from Pan-Am to Cummins did not materialize, but through the aid of Pan-Am, defendant Cummins later secured a loan from Nashville Trust Company, Nashville, Tennessee.

103. The back-lease of station No. 1375 was for a period of 12 months, with provision for its extension for successive periods of 6 months, with the right in either party to terminate the same at the end of any six months on 10 days notice.

104. The back-lease of station No. 1375 was subject to termination upon termination of the distributor's sales agreement existing between the parties.

105. The primary lease of station No. 1375 from defendant Cummins to plaintiff Pan-Am contained no termination right in favor of Cummins.

106. The distributor's sales agreement existing between plaintiff and defendant was subject to cancellation by plaintiff Pan-Am upon 90 days notice.

107. The effect of cancellation of the distributor's sales agreement was termination of the back-lease, but such cancellation had no termination effect on the primary lease, of station No. 1375.

108. As a result of the primary lease from defendant Cummins to plaintiff Pan-Am, of the back-lease from Pan-Am to Cummins, and of the distributor's sales contract, it was possible for Pan-Am to deprive Cummins of possession and control of his leasehold estate for a period of 20 years.

109. By 90-day notice given December 31, 1955, plaintiff Pan-Am undertook to take that possession and control away from defendant Cummins by cancellation of the distributor's sales contract, by resultant termination of the back-lease and by retention of the primary lease with its unexpired tenure in favor of Pan-Am.

110. At the time of the lease and back-lease of station No. 1375, defendant Cummins did not anticipate or contemplate this long-period loss of possession and control of his leasehold property and would not have entered into the transactions as lease transactions alone, but entered into them for the purpose of securing a loan from Pan-Am.

111. For the limited period on which evidence is available, station No. 1375 yielded no rental under the excess gallonage provision.

112. There being no evidence to the contrary, the monthly rental for station No. 1375 was the fixed rental of $85.

113. As a result of the termination, if the same were allowed to stand, plaintiff Pan-Am would be obligated to pay the monthly rental of $85, plus one cent per gallon for all gasoline delivered to station No. 1375 for sale in any monthly period in excess of 8,500 gallons.

114–116. Findings numbered 29, 30 and 31 with reference to Service Station No. 1367 are herewith incorporated by reference as findings numbered 114, 115 and 116 with reference to Service Station No. 1375.

117. The reasonable cash value of defendant's leasehold estate with the service station he had constructed on

the leasehold premises, and designated as Service Station No. 1375, is $10,000.

118. The reasonable rental value of station No. 1375, in excess of the ground rent, is $150.

119. Under plaintiff's take-over plan, plaintiff Pan-Am would have the possession, use and control of Service Station No. 1375 for a monthly rental of $85 plus gallonage, or approximately $85, and would not be obligated to pay the ground rent or bear any part of the expenses of taxes, insurance or maintenance.

120. A rental of $85 per month would absorb an annual depreciation of approximately 10%, based upon a valuation of the leasehold of $10,000. But with the $85 per month reduced by depreciation, insurance, maintenance, taxes, and the monthly ground rent of $65 combined, the result would be that defendant Cummins would receive substantially less than nothing from his leasehold investment over a remaining period of slightly more than 10 years.

Conclusions of Law

1. The leases and back-leases on Service Station Nos. 1367, 1370, 1578, and 1375, considered purely as lease transactions, were without any practical or justifiable business significance.

2. Said leases and back-leases assumed a business significance only when considered as the inducing factors in negotiation of loans and in aiding the arrangements for the security of such loans.

3. Plaintiff Pan-Am's attempt to terminate the back-leases while retaining the benefits of the primary leases was an attempted perversion of the motivating purpose which brought the leases and back-leases into existence.

4. The result of such perversion, if allowed to stand, would be the subjection of defendant Cummins to such gross inequity as to amount to actual fraud.

5. A comparison of documents and their supporting proof results in a clear and convincing predominance of evidence that the four sets of transactions were entered into as loan-security transactions and not as independent lease and back-lease transactions.

6. Parol evidence was admissible to show that the leases and back-leases were intended by defendant Cummins as security transactions in the nature of collateral mortgages and that their nature as such was fostered in his mind by representations of agents of the plaintiff and that by reason of those circumstances they are subject to reformation and should be reformed to give them the effect of mortgage transactions. Jones v. Cullen, 100 Tenn. 1, 42 S.W. 873; Prudential Ins. Co. of America v. Strickland, 6 Cir., 187 F.2d 67, at page 70.

7. With this reformed construction placed upon the several security transactions, Pan-Am's attempted rescission of its own obligations in relation thereto while at the same time retaining the benefits incident therein in its own favor, violated a fundamental rule of rescission which required restoration of the *status quo*. Brady v. Oliver, 125 Tenn. 595, at page 622, 147 S.W. 1135, at pages 1141–1142, 41 L.R.A.,N.S., 60; A. Landreth Co. v. Schevenel, 102 Tenn. 486, at page 492, 52 S.W. 148, at page 149.

8. Pan-Am's termination of the distributor's sales contract and attempted rescission of its own obligations in relation to the several security transactions while at the same time retaining the benefits incident therein in its own favor, if allowed to succeed, would result in an unconscionable business outrage upon the defendant Cummins and for that reason imposes upon the court the duty to grant to defendant cancellation of the primary leases, as an alternative to reformation. Mays v. Preweet, 98 Tenn. 474, 40 S.W. 483; Coffee v. Ruffin, 44 Tenn. 487, at page 507.

9. However, because of the mortgages heretofore listed and the assignments of rentals to the bank, the right of can-

cellation should be granted subject to the condition that the rights of the bank, which bank has not been made a party, shall not be prejudiced by exercise of the right of cancellation.

As judgment has heretofore been entered ordering in behalf of the defendant the relief above indicated as his right, the order entered in relation to plaintiff's various motions should recite that the aforesaid judgment is confirmed and will stand as the judgment of the court as though entered pursuant to these findings of fact and conclusions of law.