In re Molly Jane COLEMAN, Debtor.

**Molly Jane Coleman, Appellant and Cross Appellee,**

v.

**Community Trust Bank, N.A., Appellee and Cross Appellant.**

Nos. CIV.A. 1:03CV00002, CIV.A. 1:03CV00003.

United States District Court, W.D. Virginia, Abingdon Division.

Sept. 30, 2003.

John M. Lamie, Browning, Lamie and Gifford, Abingdon, VA, for debtor.

Mark L. Esposito, Penn, Stuart & Eskridge, Bristol, VA, Charles H. Keen, United States Department of Justice, Washington, DC, for appellee.

## *MEMORANDUM OPINION*

GLEN M. WILLIAMS, Senior District Judge.

### I. Introduction

This case is before the court on appeal and cross appeal from the decision of the United States Bankruptcy Court for the Western District of Virginia (hereinafter, "Bankruptcy Court"). The Appellant and Cross Appellee, Molly Jane Coleman, contends that the Bankruptcy Court erred in

finding that two deeds of trust could be avoided but only to the extent necessary to pay the creditors and otherwise to remain in effect. Mrs. Coleman further contends that it was error for the Bankruptcy Court to rescind its order dated March 21, 2002 and order her to file a modified Plan. Cross Appellant, Community Trust Bank, N.A. (hereinafter, "Bank"), contends that the Bankruptcy Court erred in denying the Bank's motion to dismiss the Chapter 11 case for lack of good faith and improper purpose. The Bank further maintains that it was error for the Bankruptcy Court to fail to address or sustain the Bank's contention that the debtor was estopped to assert or recover upon the causes of action set forth in the Adversary Proceeding. The Bank states further that the determination by the Bankruptcy Court that the Debtor met her burden of proof under Virginia Code § 55–80 and Tennessee Code § 66–3–101 is clearly erroneous. The Bank also contends that it was error for the Bankruptcy Court to set aside the deeds of trust with respect to the interest of non-debtor, non-plaintiff, Roger Coleman. This court exercises appellate jurisdiction in this matter pursuant to 28 U.S.C. § 158(a), and **AFFIRMS** the decision of the Bankruptcy Court.

## II. Standard of Review and Facts of the Case

In reviewing the decision of the Bankruptcy Court, this court uses two standards of review. The court reviews all factual findings of the Bankruptcy Court under the "clear error" standard. *De novo* review is exercised as to matters of law. *In re Bullion Hollow Enterprises, Inc.*, 185 B.R. 726, 728 (W.D.Va.1995) (citing *In re Midway Partners*, 995 F.2d 490, 493 (4th Cir.1993)).

The facts pertaining to this case are generally not in dispute. Mrs. Coleman is married to Roger Coleman (hereinafter "Coleman"), who also filed for Chapter 11 prior to Mrs. Coleman. Coleman was involved in the coal industry for some time and was somewhat successful. He was partners with Darrell Cook (hereinafter "Cook"), who also filed his own Chapter 11 case with the Bankruptcy Court. Coleman and Cook elected to conduct business under a "Subchapter S" election, which meant that any profits were taxed against the individuals personally as owners of the business. Coleman and Cook owned several businesses together, and one of them generated a profit of more than $1 million in 1993, which was taxed personally to Coleman and Cook. However, the profits generated in the various companies did not personally benefit Coleman and Cook because the profits for each business were largely used to fund operations in one or more of their other companies. As a result, the Colemans were unable to pay their tax liability assessed in 1993.

Coleman and Cook had obtained financing for their businesses from Pikeville National Bank, now known as Community Trust Bank. The Bank took a security interest in the operating assets of the coal companies as collateral for the loans that were given to Coleman and Cook. At some point, Coleman and Cook sought the Bank's approval to extend the term of the financing and to move some of the secured assets to another location.

In or about 1995, Coleman and his wife, Mrs. Coleman, were concerned that the Internal Revenue Service (hereinafter "IRS") would collect on the 1993 tax liability by levying on their valuable residence and farm located in Buchanan County, Virginia, and also a vacation residence located in Sullivan County, Tennessee, on South Holston Lake. As a result, the Colemans sought legal advice, and upon advice of counsel, granted on January 18, 1995, two deeds of trust upon the properties in ques-

tion to secure to the Bank the repayment of Coleman's liability upon his outstanding business loans. Mrs. Coleman was not a party to these loans and no new loan was advanced when the deeds of trust were granted to the Bank. Mrs. Coleman contends that her reason for signing these deeds of trust was to prevent the IRS from levying upon the two properties.

The Bank continued its business relationship with Coleman and Cook and eventually after much hardship the coal businesses ultimately failed, a downfall that led Coleman and Cook to file personal petitions in the Bankruptcy Court. Coleman, as debtor-in-possession, filed an Adversary Proceeding which sought to avoid the 1995 deeds of trust which he and his wife had granted to the Bank. After a robust defense by the Bank to the Adversary Proceeding, Coleman attempted to join Mrs. Coleman as a party. The Bank contested this motion and it was ultimately denied by the Bankruptcy Court on August 2, 2002. Upon Coleman's motion, his Chapter 11 proceeding was converted into a Chapter 7 proceeding on October 6, 2000. He obtained a discharge on January 9, 2001, and his case was closed on February 14, 2001.

As a result, the Bank had made arrangements to enforce its debts against the properties owned jointly by Coleman and Mrs. Coleman. In order to accomplish this task, the Bank hired an auction company to advertise and sell the properties; the sales were to take place on March 23, 2001. However, the day prior to the sale date, Mrs. Coleman filed her Chapter 11 petition in the Bankruptcy Court to prevent the taking of her home and to attempt to avoid the 1995 deeds of trust held by the Bank. Within one week, Mrs. Coleman filed an Adversary Proceeding challenging the deeds of trust on the ground that the deeds were given to hinder the collection process of the IRS and were

voidable under the laws of Virginia and Tennessee as fraudulent conveyances. Generally, this was not a claim available to Mrs. Coleman because she was a party to the transaction and any challenge had to be mounted by the creditor or creditors adversely affected by the conveyance of the deeds of trust. However, being a debtor-in-possession, Mrs. Coleman enjoys the powers of a bankruptcy trustee to assert rights possessed by creditors under state law to challenge improper transfers by virtue of 11 U.S.C. § 544(b).

Mrs. Coleman listed four creditors in her bankruptcy petition: (1) the Bank as secured creditor in the amount of $900,000, (2) the Internal Revenue Service as an unsecured priority creditor in the amount of $260,000, (3) the Bank of America as an unsecured creditor in the amount of $7,877.10, and (4) Galen Med, Inc., doing business as Clinch Valley Medical Center, as a joint unsecured creditor in the amount of $32,000. Her petition further indicated that the value of her Virginia and Tennessee properties owned jointly with her husband was worth an aggregate amount of $745,000. The record indicates that the IRS has filed a proof of claim of 1993 income tax penalties and interest in the total sum of $571,569.63, of which $15,370 has been characterized as a secured claim and $556,199.63 has been designated as an unsecured general claim. Galen Med., Inc. has filed five proofs of claim for medical services in the total sum of $22,559.34.

Mrs. Coleman also engaged tax counsel in order to present a petition on behalf of her to seek innocent spouse equitable relief pursuant to 26 U.S.C. § 6015(f) from her tax liabilities to the IRS. Relief for all years sought except 1993 was obtained. This claim was pursued through administrative appeals and was ultimately denied.

If Mrs. Coleman was successful in the Adversary Proceeding, she had proposed

to sell in an orderly fashion as much of her property as necessary to pay her creditors in full, and that if her administrative appeal of the initial denial of innocent spouse relief was successful, she would sell the Tennessee property if necessary to pay her general unsecured creditors in full and keep the Virginia property free and clear of the 1995 deeds of trust.

At the confirmation hearing on February 12, 2002, only two ballots representing votes cast on the Debtor's proposed Plan were filed, one by Galen Med., Inc., which voted in favor of the Plan, and the other by the Bank, which voted against the Plan. The IRS did not choose to cast a ballot.

In an Order entered March 21, 2002, the Bankruptcy Court confirmed the plan of reorganization, released Mrs. Coleman from all dischargeable debts, and entered an injunction preventing all creditors affected by the Order from pursuing any action, suit or process to collect, recover, or offset such debts as personal liabilities of the debtor. The Bank filed a motion to reconsider the Order confirming the Plan and the Bankruptcy Court took the motion under advisement pending the outcome of the Adversary Proceeding.

The Adversary Proceeding was held on May 10, 2002, and the Bankruptcy Court issued a Memorandum Opinion on September 17, 2002, that granted the avoidance of the liens requested by Mrs. Coleman, but only to the extent necessary to satisfy the creditors of her estate. In addition, an Order was entered the same day granting the Bank's motion to reconsider the confirmation order of March 21, 2002, and ordered Mrs. Coleman to file an amended Plan of liquidation. Mrs. Coleman moved for reconsideration of these two issues, the

court denied these motions, and the case was then appealed to this court.

### III. Legal Discussion

**A. It was not error for the Bankruptcy court to avoid the liens only to the extent necessary to pay the creditors and otherwise to remain in effect.**

 The first issue for appeal presented by Mrs. Coleman is whether it was error for the Bankruptcy Court to avoid the two deeds of trust only to the extent necessary to pay the creditors and otherwise to remain in effect. Mrs. Coleman argues that this was error because the section of the Bankruptcy Code relied upon by the Bankruptcy Court in its determination places no limitations for avoiding a lien on property of the estate. See 11 U.S.C. § 544. Further, Mrs. Coleman contends that the "best interest of the estate" analysis utilized by the Bankruptcy Court in construing the avoidance allowed under section 544 was inappropriate. According to Mrs. Coleman, only Section 550, which was not at issue in the case, is subject to the "benefit of the estate" language, not Section 544, which was at issue in this case.

Section 544 provides that a bankruptcy trustee as well as a debtor-in-possession [1] may avoid any transfers and liens that could have been avoided by a creditor under the applicable state law of fraudulent transfers. See 11 U.S.C. § 544(b). The question becomes, however, to what extent can such fraudulent transfers be avoided? The Bankruptcy Court in this case held that the transfers could be avoided only to the extent necessary to pay the creditors of Mrs. Coleman's estate and then remain in effect. As stated above, such issues of law are reviewed *de novo* by this court. *In re Bullion Hollow Enterprises, Inc.,*

---

1. *See Gandy v. Gandy (In re Gandy),* 299 F.3d 489, 497 (5th Cir.2002)(holding that a Chapter 11 debtor in possession may exercise the avoiding powers of the trustee under Section 544).

185 B.R. 726, 728 (W.D.Va.1995) (citing *In re Midway Partners*, 995 F.2d 490, 493 (4th Cir.1993)).

The basic canon of statutory interpretation that must be adhered to by a court attempting to interpret the language of a statute is to begin with the literal language of the statute. *Selgeka v. Carroll*, 184 F.3d 337, 342–43 (4th Cir.1999); *Carbon Fuel Co. v. USX Corp.*, 100 F.3d 1124, 1133 (4th Cir.1996). This court's inquiry must cease if the statutory language is unambiguous and "the statutory scheme is coherent and consistent." *United States v. Ron Pair Enterprises, Inc.* 489 U.S. 235, 240, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). This determination is to be controlled by reference to the specific language at issue, the context in which the language is used, and the broader context of the statute as a whole. *Ron Pair Enterprises, Inc.*, 489 U.S. at 240–41, 109 S.Ct. 1026. After examining these factors, an ambiguity exists if two or more constructions can be assigned to the meaning of the statute, or if the language of the statute is so obscure that reasonable minds may possess uncertainty as to the statute's meaning. 73 Am Jur 2D *Statutes* § 114 (2002). It is not the province of this court to redraft certain legislation in order to make it more grammatically correct or more in accord with the thoughts of this court, but it is the court's province to construe arguably contradictory statutory provisions in order to reconcile them where the intent of the lawmakers is clear but their execution of that intent is a bit flawed. *Atwell v. Merit Systems Protection Bd.*, 670 F.2d 272, 286 (C.A.D.C.1981).

In looking at Section 544, which does not include "benefit of the estate" language in context with the other provisions around it, specifically Section 550, which includes "benefit of the estate language" as well as a reference to Section 544, it is clear to the court that an ambiguity exists and that reasonable minds can differ as to the interpretation of Section 544.[2] As a result of this ambiguity and difference in understanding among reasonable minds, it is proper for this court to look to the legislative history to ascertain the legislative intent in drafting these sections of the Bankruptcy Code.

It appears from the court's research into the legislative history of these two sections that when the new Bankruptcy Code was drafted, the drafters intentionally separated the avoidance and recovery provisions in order to quell some confusion that existed under the previous Bankruptcy Act. *See* Communication from the Executive Director, Commission on the Bankruptcy Laws of the United States, Report of the Commission on the Bankruptcy Laws of the United States, pt. II, Section 4–609, at 178–180 (July, 1973); 5 COLLIER ON BANKRUPTCY § 550.LH (2003). Under the previous Bankruptcy Act of 1898, each avoidance section included its own recovery scheme. *See, e.g.*, 11 U.S.C. § 67 *et seq.* (repealed). However, when the enactment of the current Bankruptcy Code which repealed the previous Bankruptcy Act, Sections 544, 545, 547, 548, and 549 govern avoidance while Section 550 alone governs whether, and to what extent, such avoided transfers may be recovered. According to a House of Representatives Report, "[s]ection 550 . . . enunciates the separation between the concepts of avoiding a

---

**2.** *Compare Weaver v. Aquila Energy Marketing Corp.*, 196 B.R. 945 (S.D.Tex.1996)("In short § 550 is a rights and liabilities provision, not an affirmative recovery provision;" therefore, it applies to all avoidance actions) *with In re* *Glanz*, 205 B.R. 750 (Bankr.D.Md.1997)(holding that the provisions included in Section 550 do not apply to nonpossessory transfers because Section 550 and Section 544 are separate remedies).

transfer and recovering from a transferee." H.R.Rep. No. 595, 95th Cong., 1st Sess. 375 (1977), reprinted in 1978 U.S.C.C.A.N. pp. 5787, 5963, 6331 (hereinafter "House Report No. 595").

Further, the legislative history of Section 544 indicates that Congress intended that the avoidance allowed in Section 544 be subject to the benefit of the estates analysis included in Section 550. This rule was introduced in *Moore v. Bay*, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931), which interpreted Section 70(e) of the former Bankruptcy Act, the predecessor to Section 544(b). *Moore* stands for two overarching propositions. First, the decision allowed a trustee to avoid a transfer entirely without regard to the size of the claim of the creditor whose rights and powers the trustee was asserting, with the recovery to be retained for the benefit of the entire estate. *Moore*, 284 U.S. at 4, 52 S.Ct. 3. Secondly, *Moore* stands for the proposition that whatever recovery that the trustee is allowed is for the benefit of all creditors, including those who had no right to avoid the transfer. *Moore*, 284 U.S. at 4, 52 S.Ct. 3. Even though *Moore* was met with a firestorm of debate, the Bankruptcy Code when enacted, was silent with regard to the rule adopted in *Moore*. See 5 COLLIER ON BANKRUPTCY § 544.09[5] (2003). However, an intention to keep the rule of *Moore* is stated in Committee Reports. *See* House Report No. 595; S.Rep. No. 95–989, 95th Cong., 2d Sess. 85 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787.

Further, the language of Section 550 itself lends credence to the proposition adopted in *Moore* and shows an intention by Congress to have the recovery as a result of the avoidance allowed by Section 544 be subject to a benefit of the estate limitation. Section 550 states, in part, "Except as otherwise provided in this section, to the extent that a transfer is avoided *under section 544* ... of this title, the trustee may recover, for the *benefit of the estate* ...". (Emphasis added).

Consequently, in reading the language of the sections of the Bankruptcy Code in context, this court is able to see how reasonable minds would differ, thus creating an ambiguity. Furthermore, the legislative history of Sections 544 and 550 indicate that the two sections are intertwined, creating an obligation for the Bankruptcy Court to allow an avoidance only to be recovered to the extent that it benefits the estate.

In conclusion, for the reasons mentioned in the preceding paragraphs, this court finds that the Bankruptcy Court did not err in concluding that the deeds of trust be set aside but only to the extent necessary to pay the creditors of Mrs. Coleman's estate. The decision of the Bankruptcy Judge restricting the recovery from the avoidance of the fraudulent transfers is affirmed.

**B. It was not error for the Bankruptcy Court to rescind the confirmation order of March 21, 2002.**

Based on the above discussion which led this court to affirm the decision of the Bankruptcy Judge limiting recovery of the avoided deeds of trust only to the extent necessary to benefit creditors of the estate, this court also finds that it was not error for the Bankruptcy Court to rescind its Order entered March 21, 2002. As stated by the Bankruptcy Judge in his Memorandum Opinion which was entered September 17, 2002, the court initially treated the issue of avoidance of the deeds of trust as an all or nothing game; either the court would allow the deeds to be avoided entirely or not at all. However, after the Adversary Proceeding, new authority came to the attention of the Bankruptcy Court in its research leading the

Bankruptcy Court to come to the conclusion that its original order was flawed. Consequently, the Bankruptcy Judge ordered Mrs. Coleman to file a revised Plan of liquidation.

As a result of the discussion in the preceding section, which will not be repeated here, the court affirms the Bankruptcy Court's decision to rescind the confirmation order dated March 21, 2002, because the Bankruptcy Court's decision to limit the recovery of the avoided deeds only to benefit the estate was proper.

**C. It was not error for the Bankruptcy Court to deny the Bank's motion to dismiss the Debtor's Chapter 11 case for lack of good faith and improper purpose.**

■ The Bank has raised certain issues on cross appeal. The first issue is whether the Bankruptcy Court erred in denying the Bank's motion to dismiss the Chapter 11 case for lack of good faith and improper purpose. The Bank filed a Motion to Dismiss for lack of good faith and improper purpose on February 12, 2002, and the Bankruptcy Court in a Memorandum Opinion and accompanying Order entered March 21, 2002, denied the motion.

■ Chapter 11 bankruptcy proceedings are subject to dismissal for cause if not filed in good faith. 11 U.S.C. § 1112(b). "[A] good faith standard protects the judicial integrity of the bankruptcy courts by rendering their powerful equitable weapons ... available only to those debtors and creditors with 'clean hands.'" *Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1072 (5th Cir.1986). A debtor who invokes the protections of the Bankruptcy Code must act in conformity with the Code's underlying principles. 7 COLLIER ON BANKRUPTCY § 1112 (2003). When the issue of good faith is raised, the burden is upon the debtor to demonstrate that she proceeded in good faith. *In re Primestone Investment Partners, L.P.*, 272 B.R. 554, 555 (D.Del.2002); *In re Toth*, 269 B.R. 587, 590 (Bankr.W.D.Pa.2001); *In re Fox*, 232 B.R. 229, 233 (Bankr.D.Kan. 1999).

The generally accepted purpose of a Chapter 11 case is to afford the debtor the opportunity to reorganize and rehabilitate a failing business enterprise in a manner that safeguards the rights of creditors while preserving the benefits to the wide community of interest represented by the business. *See generally* 7 COLLIER ON BANKRUPTCY § 1100.01 (2003). As the Bankruptcy Court noted, no question of reorganization or rehabilitation of a business was presented in this case. Further, the court agrees with the Bankruptcy Court that the debtor has insufficient income to pay both her expenses of living and real estate taxes on the properties constituting her meaningful assets, much less satisfy her debts. As stated in the Bankruptcy Court's Memorandum Opinion entered March 21, 2002, Mrs. Coleman's purposes were:

(1) [T]o attempt to set aside two deeds of trust which she freely granted to her husband's business lender upon the claim that she and her husband intended thereby to hinder, delay or defraud their joint creditor(s), (2) to continue to seek relief as an "innocent spouse" from her portion of the liability to the IRS resulting from her husband's business activities, activities which it is clear have provided a very desirable standard of living to them both, (3) to sell off such portion of her property as may be necessary to pay her resulting liability, if any, to the IRS and her other creditors which are owed only a small fraction of the Bank's and IRS's claims, and (4) if her efforts are crowned with complete success, to then keep and enjoy the bulk of her

property after satisfying relatively small claims aggregating about $30,000 free and clear of the Bank's deficiency claim upon the business loans of approximately $900,000.

Even though these purposes may appear to the average person to be outrageous, that does not mean that in Chapter 11 proceedings that they are impermissible. Mrs. Coleman indicated four creditors in her petition: (1) the Bank, as a secured creditor in the amount of $900,000; (2) the IRS as an unsecured priority creditor in the amount of $260,000; (3) Bank of America as an unsecured creditor in the amount of $7,877.10; and (4) Galen Med., Inc., d/b/a/ Clinch Valley Medical Center, as a joint unsecured creditor in the amount of $32,000. (March 21, 2002 Memorandum Opinion at 4–5). The IRS filed a proof of claim for $571,569.63. Galen Med., Inc. filed five proofs of claim for medical services in the total sum of $22,559.34. Bank of America did not file any proof of claim. (March 21, 2002 Memorandum Opinion at 4–5.)

Mrs. Coleman is not employed, and has not been employed since the mid 1960's. (Joint Appendix, Exhibit 6, Item G, Transcript of 2/12/02 Hearing at 45–46.) Her income was derived solely from rental property, some of which is owned jointly with her husband and some of which is owned by her husband alone. The Bank contends that Mrs. Coleman "concocted a scheme to receive the rental income in her own name because she understood that she needed to have income in order to file a Chapter 11 bankruptcy petition." (Appellate Brief of Appellee/Cross Appellant at 14.) The Bank further argues that Mrs. Coleman intentionally misused the Bankruptcy process in furtherance of a scheme to delay or defraud the IRS. (Appellant Brief of Appellee/Cross Appellant at 14–15)

The Bankruptcy Court properly recognized that a Chapter 11 case may be dismissed for lack of good faith. Title 11 U.S.C. § 1112(b) provides that "[T]he [bankruptcy] court may convert a case under [Chapter 11] to a case under [C]hapter 7 of this title *or may dismiss a case under [Chapter 11],* whichever is in the best interest of creditors and the estate, *for cause* . . . ." 11 U.S.C. § 1112(b) (emphasis added).

This court found helpful the Fourth Circuit Court of Appeals' opinion in the case of *Carolin Corp. v. Miller (In re Carolin Corp.),* 886 F.2d 693 (4th Cir.1989). The Fourth Circuit held that a Bankruptcy Court can dismiss a petition for lack of good faith "only with great caution and upon supportable findings both of objective futility of any possible reorganization and the subjective bad faith of the petition in invoking this form of bankruptcy protection." *In re Carolin Corp.,* 886 F.2d at 694. The Fourth Circuit has noted that a totality of circumstances inquiry is required when determining whether to dismiss a case for lack of good faith. *In re Carolin Corp.,* 886 F.2d at 701.

The overall aim of the twin-pronged inquiry must of course be to determine whether the purposes of the Code would be furthered by permitting the Chapter 11 petitioner to proceed past filing.

The objective futility inquiry is designed to insure that there is embodied in the petition "some relation to the statutory objective of resuscitating a financially troubled [debtor]." It should therefore concentrate on assessing whether "there is no going concern to preserve . . . and . . . no hope of rehabilitation, except according to the debtor's 'terminal euphoria.'"

The subjective bad faith inquiry is designed to insure that the petitioner actually intends "to use the provision of

Chapter 11 ... to reorganize or rehabilitate an existing enterprise, or to preserve going concern values of a viable or existing business." Put obversely, its aim is to determine whether the petitioner's real motivation is "to abuse the reorganization process" and "to cause hardship or to delay creditors by resorting to the Chapter 11 device merely for the purpose of invoking the automatic stay, without an intent or ability to reorganize his financial activities."

*In re Carolin Corp.,* 886 F.2d at 701–702 (Internal citations omitted).

This court agrees with the discussion of the Bankruptcy Court in its Memorandum Opinion entered March 21, 2002, in which the Bankruptcy Court stated that it had reviewed the decisions cited by the Bank and found that these decisions (though they include language that appears to be helpful to the Bank's position) did not deal with situations related to the facts of this case. Specifically, the Bank relied upon (and relies upon in this appeal) decisions that deal with the problem of persons who are termed to be "serial filers." Further, the Bank relies upon two decisions that are not similar to this case. The first, *In re Kent,* 145 B.R. 840 (Bankr.E.D.Va. 1991), involved a proposal in Chapter 11 proceedings by the debtor to sell real estate to a famous artist for currency and pieces of artwork to be named later. The Bankruptcy Court in that case, understandably held that such a proposal did not adequately protect the interest of the objecting creditors and was therefore an objectively futile reorganization warranting the dismissal of the case. Very similar to *In re Kent* is the case of *In re Mill Place Limited Partnership,* 94 B.R. 139 (Bankr. Minn.1988). In *In re Mill Place,* the Bankruptcy Court dismissed the debtor's petition for lack of good faith, even though reorganization in that case was found to not be impossible. The Bankruptcy Court dismissed the case because rehabilitation was highly unlikely without cooperation of the foreclosing creditor, making the petition objectively futile. *In re Mill Place,* 94 B.R. at 142.

Further, the case of *In the Matter of Century City, Inc.,* 8 B.R. 25 (Bankr.N.J. 1980) appears to be similar to the matter at hand; however, upon closer inspection, that case is distinguishable as well. In that case, the debtor attempted to recover property transferred before bankruptcy as part of the settlement of a complicated dispute. The court in that case dismissed the Chapter 11 petition because the debtor, after having enjoyed the full use and benefit of the settlement for at least 6 months, filed its case "not to rehabilitate a financially distressed corporate debtor, but rather to utilize such proceeding as a vehicle to recapture the parcels of property transferred to the Restated Agreement [i.e., the settlement]," which the court concluded resulted in the misuse of the Bankruptcy Code and proceedings. *In re Century City, Inc.,* 8 B.R. at 33. Ultimately, the case was dismissed because the Bankruptcy court found that the debtor was devoid of tangible assets and creditors. *In re Century City, Inc.,* at 33.

Even though it appears to this court, as it did to the Bankruptcy Court, that Mrs. Coleman's purpose in filing for Chapter 11 protection is to preserve her home for her own use and benefit, that motivation does not necessarily preclude her from utilizing the bankruptcy process. Further, if this was the only result of her endeavor, then this court could say that she abused the process and the Bankruptcy Court should have dismissed her claim for lack of good faith. If that were so, then the Bankruptcy Court would have erred in its holding; however, that is not the case here.

Mrs. Coleman, unlike the debtors in some of the cases relied upon by the Bank, does have ascertainable creditors who would also benefit if the deeds of trust were set aside. Even if she were to prevail in her appeal of her tax liability, this fact remains true. Although the amount owed the other creditors is a little more than $30,000 and is much less than that owed to the IRS and the Bank, these entities are still actual creditors of Mrs. Coleman who would benefit from her use of the bankruptcy processes. As a result, the proceedings were not objectively futile; at least some of her creditors would be paid. Consequently, pursuant to the Fourth Circuit's approach to the good faith requirement, the inquiry into good faith fails if at least one of the two prongs is not present. Even though, as the Bank argues in its Appellate Brief, Mrs. Coleman may have "filed her case with the express and premeditated purpose of preventing foreclosure upon her property and to use the Bankruptcy process to avoid the deeds of trust that she voluntarily signed, thereby seeking to benefit from her own bad motive," the fact that the Fourth Circuit has sought fit to require proof of both objective futility as well as subjective bad faith is dispositive of this matter. The fact that her petition is not objectively futile defeats a claim of bad faith filing in and of itself. *See generally In re Carolin Corp.,* 886 F.2d 693 (4th Cir.1989).

Therefore, this court affirms the decision of the Bankruptcy Court denying the Bank's Motion to Dismiss for lack of good faith.

**D. The Bankruptcy Court did not err in failing to address or sustain the Bank's contention that the Debtor was estopped to assert or recover upon the causes of action set forth in the Adversary Proceeding.**

■ The second issue raised on appeal by the Bank is whether the Bankruptcy Court erred in failing to address or sustain the Bank's contention that the debtor was estopped to assert or recover upon the causes of action set forth in the Adversary Proceeding. Since the Bankruptcy Court did not explicitly address this issue in any of its Memorandum Opinions, this court will treat that silence as an implicit denial of the Bank's contention.

■ The doctrine of judicial estoppel has as its goal the protection of the integrity of our legal system. *Chandler v. Samford University,* 35 F.Supp.2d 861, 863 (N.D.Ala.1999). This doctrine prevents a litigant from asserting a position in a legal proceeding that is inconsistent with a previously asserted position when that inconsistency would allow the party to wrongfully manipulate our legal system. *Chandler,* 35 F.Supp.2d at 863. In order to apply the doctrine of judicial estoppel, this court must make a two-fold determination: (1) that the positions asserted are in fact inconsistent and (2) that the inconsistency would allow the party to benefit from deliberate manipulation of the courts. *Chandler,* 35 F.Supp.2d at 863.

The United States Supreme Court has stated that an individual has the right to use the provisions of Chapter 11 of the Bankruptcy Code. See *Toibb v. Radloff,* 501 U.S. 157, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991). The Supreme Court concluded in *Toibb* that the plain language of the statute did not impose any ongoing business requirements to Chapter 11. *Toibb,* 501 U.S. at 160–61, 111 S.Ct. 2197. Consequently, Mrs. Coleman, as an individual possesses the right to use the strong arm provisions of 11 U.S.C. § 544(b) in order to attempt to gain assets to distribute to her creditors.

The Bank argues in its brief that Mrs. Coleman's filing was "nothing more than an egregious and calculated manipulation

of the Bankruptcy Code and process and misuse of the 'strong arm powers' of a debtor in possession under 11 U.S.C. § 544(b) for an improper purpose." (Appellate Brief of Appellee/Cross Appellant at 21.) The Bank rightfully concluded that the "strong arm" provisions of 11 U.S.C. § 544(b) confer no greater rights of avoidance upon the debtor than a creditor would have if it were asserting the cause on its own behalf. See 7 COLLIER ON BANKRUPTCY § 544.08[1] and § 544.09[3]; *Heffron v. Duggins*, 115 F.2d 519 (9th Cir.1940); *In re Luis Elec. Contracting Corp.*, 149 B.R. 751 (Bankr.E.D.N.Y.1992); *In re Lyons*, 130 B.R. 272 (Bankr.N.D.Ill.1991). However, what the bank fails to realize is that is what Mrs. Coleman was doing; she was asserting the rights of one of her creditors to avoid the fraudulent transfer. In particular, Mrs. Coleman was asserting the rights that the IRS had to bring an action to set aside the two deeds of trust as fraudulent transfers pursuant to Section 55–80 of the Code of Virginia and Section 66–3–101 of the Tennessee Code. Under the "strong arm" powers of Section 544(b) of the Bankruptcy Code, Mrs. Coleman is afforded power as a debtor in possession, a party that enjoys the same avoidance rights as a Trustee in bankruptcy.

This court would like to further point out that even if Mrs. Coleman were to prevail upon her appeal of her tax liability, she would not receive the windfall that the Bank would like this court to believe that she would receive. After the Adversary Proceeding, the Bankruptcy Court issued a Memorandum Opinion on September 17, 2002, in which the Bankruptcy Court struggled with the fact that Mrs. Coleman may receive a windfall if the deeds of trust were avoided. (September 17, 2002 Memorandum Opinion at 26–31.) The Bankruptcy Court, after a lengthy discussion of precedent, came to the conclusion that "the 1995 deeds of trust should be avoided to the extent necessary to pay the valid claims of the IRS and Mrs. Coleman's other creditors as well as any deficiency in the bankruptcy estate to pay the administrative expenses of the estate; including such fees as may be allowed by the Court to counsel for the Debtor–in–Possession for his services of benefit to the estate and its creditors, but that they (i.e., the deeds of trust) should otherwise be left in effect for the benefit of the Bank as to any remaining surplus value of the properties they encumber." (September 17, 2002 Memorandum Opinion at 30–31.) Consequently, Mrs. Coleman's institution of bankruptcy proceeding, though somewhat motivated by a desire to protect her property from the IRS, will still benefit her other creditors.

Further, the Bank argues in its Brief that Mrs. Coleman is manipulating the bankruptcy system in that she is attempting to assert the rights of the IRS in setting aside the 1995 deeds of trust as fraudulent conveyances at the same time that she is disputing the validity of the IRS's claim as she continues to pursue her appeal of her application for innocent spouse protection. (Appellate Brief of Appellee/Cross Appellant at 22.) At first glance, these two positions may appear to be wholly inconsistent; however, upon closer consideration, this court is of the opinion that they are not. In particular, on the one hand Mrs. Coleman is asserting the rights of the IRS to avoid the fraudulently conveyed 1995 deeds and on the other she is asserting her alleged rights as an innocent spouse. In the former, she is stepping into the shoes of the IRS, which is allowed under Section 544(b). In the latter, she occupies her own shoes as a taxpayer seeking relief under the Tax Code. As a result, she is asserting two totally separate and distinct rights that are afforded her by law. In addition, as Mrs. Coleman points out in her Brief, the Bank-

ruptcy Court admitted that Mrs. Coleman had the intent to attempt to "save" her residence and that if that were the sole result of her efforts that would be an abuse of the bankruptcy proceedings. But as this court has pointed out above, Mrs. Coleman's efforts would benefit not only the IRS (if she were to fail on her claim to receive innocent spouse protection) but it would also benefit her other creditors who may possess claims smaller than the Bank and the IRS but nonetheless possess valid, actual claims.

The court affirms the Bankruptcy Court's implicit decision with regard to this matter.

**E. The determination of the Bankruptcy Court that the Debtor met her burden of proof under Virginia Code § 55–80 and Tennessee Code § 66–3–101 is not clearly erroneous.**

**1. *Setting aside of deed of trust affecting the Virginia property pursuant to Virginia law.***

The text of Virginia Code § 55–80 is as follows:

> Every gift, conveyance, assignment or transfer of, or charge upon, any estate, real or personal, every suit commenced or decree, judgement or execution suffered or obtained and every bond or other writing given with intent to delay, hinder or defraud creditors, purchasers or other persons of or from what they are or may be lawfully entitled to shall, as to such creditors, purchasers or other persons, their representatives or assigns, be void. This section shall not affect the title of a purchaser for valuable consideration, unless it appear that he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor.

VA. CODE ANN. § 55–80 (Michie 2003).

In order to set aside a conveyance as fraudulent in Virginia, the Virginia Supreme Court has ruled that the person seeking to set aside the transfer under Section § 55–80 must prove (1) that the transfer was made with the intent to delay, hinder or defraud creditors and (2) that the transferee had notice of the transferor's intent to defraud. VA. CODE ANN. § 55–80 (Michie 2003) ("This section shall not affect the title of a purchaser for valuable consideration, unless it appear that he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor."); *Hutcheson v. Savings Bank,* 129 Va. 281, 105 S.E. 677, 680 (1921); *Colonial Investment Co. v. Cherrydale Cement Block Co.,* 194 Va. 454, 73 S.E.2d 419, 422 (1952); *Bank of Commerce v. Rosemary & Thyme, Inc.,* 218 Va. 781, 239 S.E.2d 909, 912 (1978).

The first thing that must be proven is that Mrs. Coleman signed the deeds of trust with the intent to hinder, delay or defraud creditors. Virginia requires proof of intent to hinder, delay or defraud creditors by clear and convincing evidence. *Armstrong v. United States,* 7 F.Supp.2d 758, 764 (W.D.Va.1998); *In re Decker,* 295 F.Supp. 501, 507–508 (W.D.Va. 1969); *Hutcheson,* 105 S.E. at 680; *In re Yost,* 47 B.R. 697, 699 (Bankr.W.D.Va. 1985). Fraud is never presumed, but must be clearly and distinctly proved; however, when a prima facie case of fraud has been shown, the burden shifts, and the defendant must establish the bona fides of the transaction. *Shoemaker v. Chapman Drug Co.,* 112 Va. 612, 72 S.E. 121, 122 (1911). Further, intention to hinder or delay creditors need not be the primary, active, controlling purpose behind debtor's conveyance, in order to permit avoidance of transfers under Virginia fraudulent conveyance law; it is enough that it is one of

the purposes which debtor entertained, whether directly, or as an incident to some more active purpose. *Bank of Commerce* 239 S.E.2d at 912. A court may infer a fraudulent intent from the circumstances surrounding the transfer. *In re Sunsport, Inc.* 260 B.R. 88, 111 (Bankr.E.D.Va.2000). The second prong of the fraudulent conveyance determination that must be shown is whether the grantee knew or should have known of the grantor's fraudulent intent. "[N]either at common law nor in Virginia is it immoral or illegal to prefer one creditor to another in a deed of assignment ..., provided there is no design to secure some fraudulent or illegal pecuniary advantage or benefit therefrom to the debtor himself." *Hutcheson,* 105 S.E. at 680. In commenting on the difference between a valid and invalid preferential transfer, the Virginia Supreme Court has stated that:

> In Virginia, not all preferential transfers are invalid. At common law and under Code § 55–80, supra, an insolvent debtor may generally make a valid transfer of a portion or the whole of his assets to a bona fide creditor on account of an existing indebtedness, if that is the sole purpose of the debtor and the transfer is for full value. This is true even though such transfer may and is intended by the debtor and creditor to give such creditor a preference to the exclusion of others in the distribution of the debtor's assets .... But if the purpose to make a bona fide preference is merely incidental to the transaction and is used as a cloak for some other purpose which is fraudulent in actual intent, the transfer is invalid.

*Bank of Commerce,* 239 S.E.2d at 912 (Internal citations omitted). "It is sufficient to show that the grantee had knowledge of facts and circumstances which were naturally and justly calculated to excite suspicion in the mind of a person of ordinary care and prudence, and which would naturally prompt him to pause and inquire before consummating the transaction, and that such inquiry would have necessarily led to the discovery of the facts from which the law imputes fraud to the grantor." *Anderson v. Mossy Creek Woolen Mills Co.,* 100 Va. 420, 41 S.E. 854, 855 (1902). Proof of actual knowledge of the grantee is not necessary, but it is sufficient to prove that the grantee possessed knowledge of such facts and circumstances that would cause the grantee to look further into the possible fraud. *Crowder v. Crowder,* 125 Va. 80, 99 S.E. 746, 748 (1919); *Bank of Commerce,* 239 S.E.2d at 912.

A trustee (or debtor in possession) may establish his or her prima facie case of an intentionally fraudulent transfer by showing the presences of so-called "badges of fraud." *In re Sunsport, Inc.,* 260 B.R. at 111. Such "badges of fraud" include the following: (1) Retention of an interest in the transferred property by the transferor; (2) Transfer between family members for allegedly antecedent debt; (3) Pursuit of the transferor or threat of litigation by his creditors at the time of transfer; (4) Lack of or gross inadequacy of consideration for the conveyance; (5) Retention or possession of the property by the transferor; and (6) Fraudulent incurrence of indebtedness after the conveyance. *In re Porter,* 37 B.R. 56, 63 (Bankr. E.D.Va.1984). If a trustee (or debtor in possession) shows that some of these badges of fraud are present, there is a refutable presumption of fraud. *In re Sunsport, Inc.,* 260 B.R. at 111. Once such a prima facie case is established by the plaintiff, the burden of proof shifts to the defendant to prove that the transfer was made in good faith. *Temple v. Jones, Son & Co.,* 179 Va. 286, 19 S.E.2d 57, 62 (1942); *In re Sunsport, Inc.,* 260 B.R. at 111.

In this case, Mrs. Coleman's intention to hinder or delay the IRS was admitted by her. What little evidence that can be gleaned from the record to refute the fact that her subjective intentions were to hinder or delay the IRS by signing the deeds of trust is not strong enough to override her statements of her subjective intentions. As a result, the first prong of the fraudulent conveyance test is satisfied. It is the second prong of the test where disagreement exists in this case. It is the Bank's contention that the Bank had no knowledge of Mrs. Coleman's intentions when she signed the deeds of trust encumbering the two parcels of property. The Bank contends that it only sought to protect its interest by obtaining additional collateral in exchange for its forbearance and other concessions. On the other hand, Mrs. Coleman contends that the bank possessed knowledge of her intentions and if the Bank did not have actual knowledge of her intentions it should have known her intentions because of the presence of certain "badges of fraud."

As the Bankruptcy Court stated in its September 17, 2002 Memorandum Opinion, evidence was presented that the Bank's loan officer, Mr. Belcher stated in deposition testimony:

Q. Do you recall what led to Mr. and Mrs. Coleman giving the deed of trust to the Bank?

A. Yes.

Q. What was that?

A. There were several specific reasons.

Q. Could you expand on what those were?

A. During this time they were having financial problems, and they were in the process of desiring to move their equipment or relocate their equipment in different minesites or a minesite. They requested the Bank for permission to move and relocate its equipment. And mining equipment, especially when not in use, has a high rate of deterioration or depreciation. And additional collateral was offered.

Q. You say "additional collateral was offered." It was offered by whom?

A. By Coleman and Cook.

Q. And did you request the additional collateral before they could move the equipment, or did they just offer to give you the collateral on the loan?

A. The equipment . . . or the collateral was offered by Coleman and Cook.

Q. Right. Did they just offer that as extra security on the loan?

A. For permission to relocate the equipment, and then additional comments and requests were made. The IRS was involved. And they were negotiating with the IRS. They had obtained counsel. They were refiling their taxes on the different companies. And they requested . . . were asking time between the IRS . . . to file it. And so additional collateral was offered as collateral to obtain the time to file the amended tax returns.

Q. So they were giving you additional collateral, so they could file . . . So they could have extra time to file tax returns?

A. Yes.

Q. And the Bank . . . why were they giving collateral to the Bank and asking for time?

A. Their property was unencumbered, and the IRS would come in and levy on the property.

(Belcher deposition testimony, line 20, page 28 thru line 4, page 30.); (September 17, 2002 Memorandum Opinion at 9–10) At the trial before the Bankruptcy Court, Belcher attempted to refute this testimony as

showing the Bank's knowledge of the fraudulent intent behind the transfer by stating that it was based upon information that he obtained from the allegations contained in the Adversary Proceeding filed by Mr. Coleman against the Bank and that he had been unaware of such fraudulent intent prior to the filing of this Adversary Proceeding.

This court can only overturn the Bankruptcy Court on this issue if the Bankruptcy Court's findings of fact are clearly erroneous, because this determination of the Bankruptcy Court is based upon factual findings of the Bankruptcy Court. *In re Biondo,* 180 F.3d 126, 130 (4th Cir.1999). As a result, after this court's examination of the record on appeal it is of the opinion that the Bankruptcy Court's determination that Mrs. Coleman did grant the deeds of trust to the Bank for the purpose of hindering the collection efforts of the IRS is not clearly erroneous. As stated earlier, Mrs. Coleman's testimony that she intended to hinder the collection efforts of the IRS is practically uncontradicted. Further, the Bankruptcy Court was in a position to hear Mrs. Coleman testify and see her demeanor; therefore, that court was in a better position than this court to determine whether she appeared credible. This court must defer to the Bankruptcy Court in its factual findings as long as they are not clearly erroneous. Consequently, this court finds no reason to overrule the Bankruptcy Court's finding that Mrs. Coleman granted the deeds of trust to hinder the collection efforts of the IRS.

The harder determination; however, comes with regard to the Bank's knowledge of Mrs. Coleman's intent in granting the deeds of trust. However, after this court's review of the record on appeal, this court is of the opinion that the Bankruptcy Court's finding that the Bank's knowledge can be imputed from the knowledge of Mr.

Belcher is not clearly erroneous. Even though Mr. Belcher contended at the trial before the Bankruptcy Court that he was unaware that when the deeds of trust were granted, they were granted with the intention of hindering the collection efforts of the IRS, the Bankruptcy Court concluded based on the combination of the statements contained in his December 9, 1994 memo (in which Mr. Belcher mentioned the IRS), his responses to cross-examination conducted by IRS counsel at trial, the apparent candor of his discovery deposition testimony, and the Bankruptcy Court's own perception of Mr. Belcher's demeanor at trial, including the variations in his testimony there, that Mr. Belcher was aware that one of the motivating reasons for granting the deeds of trust was to hinder the collection efforts of the IRS. (September 17, 2002 Memorandum Opinion at 21.) This court finds no reason to overrule this finding of the Bankruptcy Court because, yet again, this court must defer to the factual findings of the Bankruptcy Court unless they are clearly erroneous; here, they are not. Because Mr. Belcher was an officer of the Bank and its designated responsible person for the supervision of the Coleman and Cook loans, his knowledge is deemed the knowledge of the Bank itself. In addition the following badges of fraud were proven during the bankruptcy proceeding: (1) Mrs. Coleman and her husband were under heavy financial pressure by the IRS; (2) an eleven year relationship existed between the Bank and the Colemans; (3) the transfer encumbered essentially all of the Coleman's assets available to creditors' collection efforts; and (4) the Colemans continued to retain possession and enjoyment of the property after the transfer. So, even if Mr. Belcher knew nothing about Mrs. Coleman's subjective intent, sufficient badges of fraud were present to put him on notice that the transaction that he was

entering into on the part of the Bank was suspicious. This court agrees with the Bankruptcy Court that as a result of this knowledge of one of its officers (whether through actual knowledge or through implied knowledge because of the badges of fraud), the Bank cannot claim that the transaction between itself and Mrs. Coleman was a bona fide transaction that should be afforded protection under Virginia Code § 55–80.

As a result, it is the finding of this court that Mrs. Coleman carried her burden of proof under Virginia law because she produced clear and convincing evidence that she granted the 1995 deeds of trust in order to hinder or delay the IRS. Further, she produced evidence of certain "badges of fraud" that coupled with her intent made a prima facie case, thus transferring the burden to the Bank to prove that the transaction was conducted in good faith. However, the Bank failed in that it could not refute its knowledge because of the knowledge of one of its officers, Mr. Belcher. Consequently, Mrs. Coleman carried her burden of proof under Virginia Code § 55–80 and the Bankruptcy Court's factual determinations that supported these findings were not clearly erroneous. The Bankruptcy Court's determination of this issue is affirmed.

## 2. *Setting aside the deed of trust of the Tennessee property pursuant to Tennessee law. Conveyances in fraud of creditors or purchasers void.*

Tennessee Code § 66–3–101 states as follows:

Every gift, conveyance of lands, tenements, hereditaments, goods, or chattels, or of any rent, common or profit out of the same, by writing or otherwise; and every bond, suit, judgement, or execution, had or made and contrived, of malice, fraud, covin, collusion, or guile, to the intent or purpose to delay, hinder, or defraud creditors of their just and lawful actions, suits, debts, accounts, damages, penalties, forfeitures; or to defraud or to deceive those who shall purchase the same lands, tenements, or hereditaments, or any rent, profit, or commodity out of them, shall be deemed and taken, only as against the person, such person's heirs, successors, executors, administrators, and assigns, whose debts, suits, demands, estates, or interest, by such guileful and covinous practices as aforementioned, shall or might be in any wise disturbed, hindered, delayed, or defrauded, to be clearly and utterly void; any pretense, color, feigned consideration, expressing of use, of any other matter or thing, to the contrary notwithstanding.

As the Tennessee Supreme Court stated over 100 years ago, "The law sanctions and commands diligence and vigilance on the part of ... creditors, in securing their just demands. But in the race amongst them for priority, it discountenances and forbids all resorts to covinous, guileful or fraudulent devices or practices. [This section of the Tennessee code] was intended to secure entire fairness amongst creditors in their efforts to secure their debts." *Hickerson v. Blanton & Co.,* 49 Tenn. (2 Heisk.) 160, 160, 1870 WL 2780 (1870). Under this section, transfers are fraudulent if they either are without fair consideration and leave the grantor insolvent or are made with actual intent to hinder, delay or defraud creditors. *Macon Bank & Trust Co. v. Holland,* 715 S.W.2d 347, 349 (Tenn.Ct.App. 1986). Further, in determining whether a particular conveyance is fraudulent, the court must look to the facts and circumstances of each case. *Stevenson v. Hicks (In re Hicks),* 176 B.R. 466, 470 (Bankr. W.D.Tenn.1995). In addition, the general rule in Tennessee is that the party attack-

ing the conveyance has the burden of proof. *United Nat. Real Estate, Inc. v. Thompson*, 941 S.W.2d 58, 62–63 (Tenn.Ct. App.1996) (citing *Citizens Bank and Trust v. White*, 12 Tenn.App. 583 (1930)).

Not only must the fraudulent intent of the grantor be established, if fair consideration is given for the conveyance, it must be shown that the grantee has knowledge of the purpose and participated in the fraudulent design. *Gregory v. Guinn*, 4 Tenn.App. 10, 15, 1926 WL 2093 (1926); see also *First National Bank of Centreville v. Wilkins*, 11 Tenn.App. 9, 14, 1929 WL 1680 (1929) (holding that if there is no proof of fraud by the grantee and the consideration was fair, a conveyance attacked for fraud must be upheld); *Jones v. Cullen*, 100 Tenn. 1, 42 S.W. 873 (1897) (holding that the fraud of a grantor or the grantor and the trustee combined will not deprive the beneficiary of the benefit of the conveyance unless the beneficiary knew of the grantor's intent or participated in the fraud in some way).

The Tennessee courts, much like the Virginia Courts, have enumerated certain "badges of fraud," that if shown, raise a presumption of fraudulent intent on the part of the parties involved in the contested transaction. Some of these badges are as follows: (1) The transferor is in a precarious financial position; (2) Inadequate consideration was given for the transfer; (3) Secrecy or haste existed in carrying out the transfer; (4) The transfer included all or substantially all of the transferor's nonexempt property; (5) The transferor retained an interest in the property transferred; and (6) There was a lack of innocent purpose or use for the transfer. *In re Hicks*, 176 B.R. at 470.

Therefore, the law in Tennessee, much like that in Virginia, requires that a court review the transaction to see if there are badges of fraud evident in the transaction, and if there are, then a presumption of fraud arises. Once a suspicion of fraud arises, it is incumbent upon the party, though a defendant, to remove such presumption and to show the good faith and fairness of the transaction and the actual payment of the consideration. *See Jones v. Read*, 20 Tenn. 335, 1839 WL 1302 (1839); *Smartt v. Watterhouse*, 25 Tenn. 158, 1845 WL 1886 (1845); *Farnsworth v. Bell*, 37 Tenn. 531, 1858 WL 2789 (1858); *Alley v. Connell*, 40 Tenn. 578 (1859); *Dunlap v. Haynes*, 51 Tenn. 476, 1871 WL 3687 (1871); *Robinson v. Frankel*, 85 Tenn. 475, 3 S.W. 652 (1887); *Taylor v. Taylor*, 6 Tenn. Civ.App. (6 Higgins) 268 (1915). In other words, once a suspicion of fraud has arisen, then the burden shifts to the grantee who must rebut that presumption by proving that the transaction was a bona fide transaction. *See Gurlich's Inc. v. Myrick*, 54 Tenn.App. 97, 105–06, 388 S.W.2d 353 (1964).

The standard of proof in this case is hotly contested by both parties. The standard of proof that was applied by the Bankruptcy Court was a preponderance of the evidence standard. The Bank contends, however, that this was the incorrect standard of proof to be applied and that the correct standard to apply was the clear and convincing standard. Mrs. Coleman contends that the Bankruptcy Court applied the correct standard of proof.

the course of this court's research, this court found, much like the court in *Estate of Acuff v. O'Linger*, 56 S.W.3d 527 (Tenn.App.2001) found, that there are two lines of cases in Tennessee dealing with standards of proof in fraud cases. The first line deals with the tort of deceit and fraud for money damages; according to these cases, the standard of proof is a preponderance of the evidence. *See Jones v. Seal*, 56 Tenn.App. 593, 409

S.W.2d 382 (1966); *Pipkin v. Lentz*, 49 Tenn.App. 206, 354 S.W.2d 87 (1961); *Anderson v. Nichols*, 39 Tenn.App. 503, 286 S.W.2d 96 (1955); *Bevins v. Livesay*, 32 Tenn.App. 1, 221 S.W.2d 106 (1949); *Williams v. Spinks*, 7 Tenn.App. 488 (1928); *White v. Bettis*, 56 Tenn. (9 Heisk.) 645 (1872). The other line of cases deals with an attempt to set aside or reform a written instrument; the burden of proof applied in those cases is the clear and convincing standard. *See Dale v. Thomas H. Temple Co.*, 186 Tenn. 69, 208 S.W.2d 344 (1948); *James v. Joseph*, 156 Tenn. 417, 1 S.W.2d 1017 (1928); *Hendrix v. Insurance Co. of North America*, 675 S.W.2d 476 (Tenn.Ct.App.1984). *Estate of Acuff* involved the question of whether to set aside two deeds of trust because of alleged forged signatures. In its discussion, the court in *Estate of Acuff* discussed a recently decided case, *Jarmakowicz v. Suddarth*, No. M1998–00920–COA–R3–CV, 2001 WL 196982 (Tenn.Ct.App. Feb.28, 2001), in which that court distinguished the claims for the tort of fraud and deceit and claims where a party is attempting to set aside or reform an instrument; the court in *Jarmakowicz* stated the same thing: the standard of proof to set aside a written instrument is the clear and convincing standard. *Estate of Acuff*, 56 S.W.3d at 530. The court in *Estate of Acuff* concluded that "[i]t is well settled that to set aside a deed on the grounds of fraud the proof thereof must be clear, cogent, and convincing." *Estate of Acuff*, 56 S.W.3d at 531. Even though the particular section of the Tennessee Code is not mentioned anywhere in *Estate of Acuff*, this court is of the opinion that the principles iterated in that case should be applied to this section of the Tennessee Code because *Estate of Acuff* was discussing the law of Tennessee with regard to fraudulent conveyances.

The evidence that was discussed above with regard to the deed of trust affecting property in Virginia is the same evidence that Mrs. Coleman relied upon in her attempt to have the deed of trust for the Tennessee property set aside. She stated, uncontested that she intended to hinder the IRS in its collection efforts by conveying the properties to the Bank for the deeds of trust. Further, the knowledge of the bank officer as shown in his memorandum and in his own deposition testimony is imputed to the Bank. The same badges of fraud discussed in the preceding section are incorporated into this discussion and need not be repeated here. These were findings of fact of the Bankruptcy Court and cannot be disturbed unless clearly erroneous. This court sees no reason to disturb these findings because there is evidence in the record to support these findings, and the Bankruptcy Court was in a position to observe the witnesses' demeanors and to weigh their testimony accordingly.

However, even though the Bankruptcy Court should have applied the clear and convincing standard to the deed of trust that was affected by Tennessee law, Coleman would still have prevailed at the higher standard of proof. Given that the same evidence was presented by Coleman to support her contention of fraudulent intent as to both deeds of trust affecting property in Virginia and Tennessee, that evidence would be sufficient to support a finding of a fraudulent conveyance of the deed of trust to the Tennessee property even at the higher standard of proof. Stated another way, because the evidence was sufficient under Virginia law, which requires clear and convincing proof (as discussed above), it would be sufficient to support a finding that the deed of trust for the Tennessee property should be set aside. Thus, even though the Bankruptcy Court applied the wrong standard, that error was

harmless because, even at the elevated standard of proof, the evidence would still support the holding of the Bankruptcy Court that the deed of trust for the Tennessee property should be avoided because it was conveyed with the intent to hinder, delay, or defraud Mrs. Coleman's creditors.

In conclusion, this court finds no reason to overturn the decision of the Bankruptcy Court with regard to the deed of trust affecting the Tennessee property because Mrs. Coleman brought sufficient evidence to create a presumption of fraud that was not rebutted by the Bank. Further, Mrs. Coleman carried her burden of proof even under a clear and convincing standard. The Bankruptcy Court's determination of the factual issues underlying this determination was not clearly erroneous. The Bankruptcy Court's determination of this issue is affirmed.

**F. The Bankruptcy Court did not err in setting aside the deeds of trust with respect to the interest of non-debtor, non-plaintiff, Roger Coleman.**

■ The Bank contends that it was error for the Bankruptcy Court to set aside the deeds of trust with respect to the interest of Roger Coleman. It states specifically that Roger Coleman's Chapter 11 Adversary Proceeding against the Bank seeking to set aside the deeds of trust under state law was dismissed with prejudice, and that, thus, the Bankruptcy Court erred in setting aside the deeds of trust in so far as his interest in the properties are concerned. Specifically, the Bank attempts to construe the issue as a question of the Bankruptcy Court's power over certain parties and non-parties; however, upon further review by this court, this court finds that the issue is more a question of the power of the Bankruptcy Court over the property of the debtor.

■ When a debtor files a bankruptcy petition an estate in bankruptcy is created. *Universal Bonding Ins. Co. v. Gittens and Sprinkle Enterprises, Inc.*, 960 F.2d 366, 371 (3d Cir.1992). According to 11 U.S.C. § 541(a), the bankruptcy estate includes "*[A]ll* the following property, wherever located and by whomever held ... [e]xcept as provided in subsections (b) and (c)(2) of this section, *all legal and equitable interests of the debtor* in property as of the commencement of the case." (Emphasis added). Section 541 then goes on to list certain types of property that are included and excluded from the bankruptcy estate. "The Bankruptcy Court acquires jurisdiction over this bankruptcy estate and may distribute it in accordance with the various provisions of the Code, and the trustee has broad general powers over the property of the estate, subject to the supervision of the Bankruptcy Court." *In re Fair Dept. Store*, 26 B.R. 611, 612 (S.D.Ala.1982); *see also* 11 U.S.C. § 363. Consequently, once an individual files a petition in bankruptcy, the Bankruptcy Court acquires jurisdiction over all property that is included in the bankruptcy estate.

■ The question then becomes whether the two properties at issue in this appeal were part of the bankruptcy estate. The Bankruptcy Court found that the particular lands at issue in this appeal are held jointly by Roger Coleman and Mrs. Coleman as tenants by the entirety. (September 17, 2002 Memorandum Opinion at 2.) This finding has not been refuted by either side. Usually, whether an estate by the entirety has been created depends upon state law; both Virginia and Tennessee recognize tenancies by the entirety. *See* Robert D. Null, *Tenancy by the Entirety as an Asset Shield: An Unjustified Safe Haven for Delinquent Child Support Obligations*, 29 Val. U.L. Rev.

1057, 1085–1086 & nn. 207–208 (listing the states that continue to recognize estates by the entirety, which includes Virginia and Tennessee). As the Fourth Circuit has held, "a debtor's interest in entireties property becomes part of the bankruptcy estate," *In re Bunker*, 312 F.3d 145, 150 (4th Cir.2002)(citing *Sumy v. Schlossberg*, 777 F.2d 921, 924 (4th Cir.1985)), and is therefore subject to the jurisdiction of the Bankruptcy Court. The spouses that hold a tenancy by the entirety have an option under the Bankruptcy Code to claim an exemption for the property subject to the tenancy by the entirety, which exempts the property from the jurisdiction of the Bankruptcy Court and the powers of the trustee in bankruptcy. *See* 11 U.S.C. § 522(b)(2)(B). However, there is no evidence that Mrs. Coleman attempted to raise this exemption in her Chapter 11 proceedings. There is also no evidence in the record to indicate that Mr. Coleman tried to raise this exemption in his bankruptcy proceedings or in Mrs. Coleman's proceedings, which he was a party defendant to. As a result, the properties held by Mrs. Coleman and her husband as tenants by the entirety is part of the bankruptcy estate and the Bankruptcy Court, thus, had jurisdiction over these properties to make the proper determination as to how these properties should be utilized to satisfy the debts of Mrs. Coleman. It makes no difference that Mr. Coleman's bankruptcy proceeding was dismissed with prejudice, because the Bankruptcy Court looks to the property that is in the estate of the debtor before it in a given case. Even though Mr. Coleman owned this property jointly with Mrs. Coleman, Mrs. Coleman's bankruptcy petition was all that was before the Bankruptcy Court in this case. The Bankruptcy Court determined properly that, absent a claim of the exemption under the Code for estates by the entirety, the two properties should

be included in the bankruptcy estate of Mrs. Coleman and should be subject to the provisions of the Bankruptcy Code that allowed Mrs. Coleman as debtor-in-possession to avoid the deeds of trust as fraudulent conveyances.

██ As a result, the question that was before the Bankruptcy Court in Mrs. Coleman's Adversary Proceeding was whether the deeds of trust to property owned jointly by her and her husband could be avoided. Mr. Coleman's Adversary Proceeding has no binding effect on the Bankruptcy Court's determination of the issues in Mrs. Coleman's bankruptcy proceeding. The Bankruptcy Court did not adjudicate any rights of Mrs. Coleman in that Adversary Proceeding, and in fact, Mrs. Coleman's attempt to intervene in that case was successfully contested by the Bank. Mrs. Coleman was the only person that was seeking relief in this bankruptcy proceeding, not Mr. Coleman. The Bankruptcy Court, therefore, had to determine what would be included in Mrs. Coleman's estate, not Mr. Coleman's estate. As discussed above, property that is held as a tenancy by the entirety is included in the bankruptcy estate absent a claim of the exemption provided for in Section 522 of the Bankruptcy Code. That is why this is an issue about the property and not the parties/non-parties to this proceeding.

In conclusion, this court finds that the two pieces of property held by Mr. and Mrs. Coleman as tenants by the entirety should be included in the bankruptcy estate and, therefore, the Bankruptcy Court had jurisdiction over the property and, as discussed above, properly set aside the deeds of trust affecting the two properties to the extent necessary to benefit the creditors but otherwise to remain in effect. This court affirms the decision of the bankruptcy court with regard to this matter.

### IV. Conclusion

For the foregoing reasons, this court AFFIRMS the decision of the Bankruptcy Court. The clerk is directed to send copies of this Memorandum Opinion and accompanying order to all counsel of record.